**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

| | |
|---|---|
| | Case No. |
| ADALGISA SANTOS, CARL PAUL MAURILUS, and COURTNEY MAINE, individually and on behalf of all others similarly situated, | |
| Plaintiff(s), | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| ZF FRIEDRICHSHAFEN AG, ZF TRW AUTOMOTIVE HOLDINGS CORP., TRW AUTOMOTIVE INC., TRW AUTOMOTIVE U.S. LLC, TRW VEHICLE SAFETY SYSTEMS INC., HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., HONDA OF AMERICA MFG. INC., HONDA R&D CO., LTD., TOYOTA MOTOR CORP., TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., HYUNDAI MOTOR GROUP, HYUNDAI MOTOR CO., and HYUNDAI MOTOR AMERICA, | |
| Defendants. | |

# CLASS ACTION COMPLAINT
# AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

JURISDICTION AND VENUE ........................................................................................ 8

THE PARTIES.................................................................................................................... 9

    I.     TRW Defendants ................................................................................. 9

    II.    Vehicle Manufacturer Defendants ....................................................... 10

    III.   Plaintiffs............................................................................................. 13

GENERAL FACTUAL ALLEGATIONS................................................................... 15

    I.     Definitions........................................................................................... 15

    II.    TRW ACUs Have a Common, Uniform Defect ................................... 16

          A.    Defendants' Knowledge of the Defect.................................... 17

    III.   The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe".............. 25

    IV.   The Vehicle Manufacturer Defendants' Failure to Issue Recalls and
          Issuance of Late and Inadequate Recalls ............................................ 27

          A.    Failure to Provide Replacement Vehicles............................... 28

TOLLING OF THE STATUTE OF LIMITATIONS.................................................... 28

    II.    Estoppel............................................................................................... 29

    III.   Discovery Rule.................................................................................... 30

CLASS ACTION ALLEGATIONS ............................................................................. 30

    I.     The Consumer Classes......................................................................... 30

    II.    Numerosity and Ascertainability ......................................................... 31

III.    Predominance of Common Issues ........................................................................ 31

IV.     Typicality ............................................................................................................. 33

V.      Adequate Representation ...................................................................................... 33

VI.     Superiority ............................................................................................................ 34

CLAIMS FOR RELIEF ........................................................................................................... 35

I.      Nationwide Claims ............................................................................................... 35

        A.      Federal Claims Against the Vehicle Manufacturer Defendants ............. 35

        B.      Common Law and State Law Claims Against TRW .............................. 39

        C.      Common Law and State Law Claims Against Honda ............................ 41

        D.      Common Law and State Law Claims Against Hyundai ......................... 45

        E.      Common Law and State Law Claims Against Toyota............................ 48

II.     State Consumer Sub-Class Claims ....................................................................... 51

        A.      Claims Brought on Behalf of the Florida Consumer Sub-Class ............. 51

PRAYER FOR RELIEF ........................................................................................................... 56

DEMAND FOR JURY TRIAL ............................................................................................... 57

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION

1.      Airbags are a critical safety component in virtually every motor vehicle sold in the United States and throughout the world. In many instances, an airbag can mean the difference between life, serious injury, or death. People rely on the manufacturers of their cars and safety components to make products that are designed and built to keep them safe, and function as promised and intended. People expect that automakers and safety component manufacturers take every reasonable step to make sure that cars are safe for the passengers who ride in them. Profits must take a back seat to safety for the manufacturer of these safety components, and also for the automobile manufacturer when it makes its safety component sourcing decisions. Simply put, no reasonable consumer expects to purchase or lease a vehicle that poses a safety risk that an airbag will fail to deploy, or that a seatbelt will fail to constrict, during a collision.

2.      This action concerns defective airbag control units ("ACUs") designed and manufactured by ZF Friedrichshafen AG, ZF TRW Automotive Holdings Corp., and its related entities (collectively, "TRW"), and equipped in vehicles manufactured, sold, or leased by Defendants Honda, Acura, Hyundai, and Toyota and their related entities (collectively, "Vehicle Manufacturer Defendants"). ACUs are designed and manufactured to detect a vehicle crash, determine whether airbag deployment is necessary, and deploy appropriate airbags and other supplemental restraints where needed. The ACU contains an electronic component—an application specific integrated circuit ("ASIC") located in the front of the vehicle—which monitors signals from other crash sensors located in the vehicle. If the ASIC fails, the ACU will not operate properly—causing tragic and often deadly results.

3.      Airbags are critical safety features of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. In the milliseconds following a crash, the ACU is supposed to detect the crash and

send a signal to the airbag inflator to ignite the airbag propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand or deploy.

4.      Seatbelt pretensioners are also crucial safety features in any motor vehicle as they work in tandem with seatbelts to prevent a vehicle's occupant from striking hard objects such as the steering wheel, dashboard, or windshield, during a crash. A seatbelt's pretensioner is a component of the seatbelt system that locks the seatbelt in place during a crash. When the vehicle's ACU detects a crash, it sends a signal to the seatbelt pretensioner to remove slack from the seatbelt, pulling the vehicle occupant's body firmly into his seat, and milliseconds later, releasing the slack to allow the occupant to receive the maximum protection benefit from the airbag deployment.

5.      All TRW ACUs at issue in this litigation share a common, uniform design defect: the TRW ACU's defective design makes the ASIC unreasonably susceptible to damage or electrical overstress ("EOS"), which in turn prevents the ACU from properly communicating with the airbags and seatbelt pretensioners during collisions (the "ACU Defect"). Because of their uniform defective design, TRW's ACUs are unreasonably susceptible to damage or EOS conditions, which prevent the vehicles' airbags from deploying and the seatbelt pretensioners from engaging during a collision, thereby failing to protect vehicle occupants during a crash.

6.      The above Vehicle Manufacturer Defendants manufactured, sold, and leased vehicles containing TRW's Defective ACUs—concealing the ACU Defect and knowingly misrepresenting their vehicles as safe to consumers and the public.

7.      In March 2018, NHTSA's Office of Defects Investigation ("NHTSA ODI") opened a preliminary evaluation ("PE") investigation into the ACU Defect based on six frontal crashes, reported via Early Warning Reporting between 2012 and 2017, where airbags did not deploy.[1] NHTSA's investigation indicates that the ACU Defect fails to allow electrical signals to enter the ACU via sensor wiring, resulting in an EOS that causes airbags to fail to deploy during the critical milliseconds following a collision.

---

[1] Exhibit A, NHTSA, ODI Resume, Investigation EA 18-003 Mar. 16, 2018, https://static.nhtsa.gov/odi/inv/2018/INOA-PE18003-9810.PDF.

8. Instead of deploying safety devices such as airbags and seatbelt pretensioners that protect vehicle occupants from bodily injury during accidents, the defective TRW ACUs too often fail to send a signal to deploy airbags and engage seatbelt pretensioners, causing occupants to suffer serious bodily injury or death. As of May 2019, TRW's Defective ACUs have been responsible for at least 4 deaths and 6 serious injuries, worldwide.

9. Automakers that purchased TRW's Defective ACUs were involved in their design and testing and knew or should have known of the ACUs' common, uniform design defect.

10. Apart from the notice and warnings they received through their interactions with TRW, internal review, design approval, and testing, the Vehicle Manufacturer Defendants gained knowledge of the ACU Defect through various customer complaints and incidents of non-deployment. For example, TRW and Hyundai knew, discussed, and investigated non-deployment incidents as early as August 2011.

11. The Vehicle Manufacturer Defendants also had knowledge that TRW's ACUs were experiencing the same problems in other non-party automakers' vehicles. Indeed, no later than January 2016, TRW reached out to the Vehicle Manufacturer Defendants regarding the nature of the ACU Defect.

12. TRW and the Vehicle Manufacturer Defendants received word of airbag deployment failures no later than July 28, 2013, when a TRW airbag failed to deploy in a 2012 Kia Forte, in San Leandro, CA. Another airbag non-deployment incident took place on December 27, 2013 involving a 2011 Hyundai Sonata in Myrtle, MS. On March 13, 2016 there was yet another airbag non-deployment event involving a 2011 Hyundai Sonata in Omaha, NE. In each of these incidents, the ACU Defect led to a fatality.

13. Non-party Fiat Chrysler then issued a public recall of the defective TRW ACUs in the United States in September 2016, putting the TRW and the Vehicle Manufacturer Defendants, on further notice of the defect.

- 5 -

14.     Despite Fiat Chrysler's initial recall and their independent concerns about the ACU Defect, Defendants utterly failed to take any reasonable, let alone sufficient measures to investigate the ACU Defect or protect purchasers, lessees, and the general public.

15.     As overwhelming evidence of the defect grew, Defendants did not issue recalls, warn consumers, or otherwise protect them from the risk through, for example, systematic loaner vehicle programs. Indeed, it was not until 2018 that Hyundai finally issued limited recalls. Incredibly, Honda and Toyota continue to refuse to recall their affected vehicles, despite knowing they contain the same deadly ACU Defect.

16.     The Vehicle Manufacturer Defendants' failure and/or delay in issuing recalls and providing replacement parts is consequential—it exposes purchasers, lessees, drivers, passengers, and, indeed, the general public, to an ongoing and unnecessary risk of harm.

17.     Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months and possibly years while they wait for Defendants to recall and replace the defective TRW ACUs in their cars. Plaintiffs are effectively left without safe vehicles to take them to and from work, pick up their children from schools or daycares, or, in the most urgent of situations, transport themselves or others to hospitals.

18.     Defendants knew, and certainly should have known, that the TRW ACUs installed in millions of vehicles were defective.  By concealing their knowledge of the nature and extent of the ACU Defect from the public, while continuing to advertise their products as safe and reliable, Defendants demonstrated a blatant disregard for public welfare and safety. Moreover, Defendants violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

19.     As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages.  Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer

expectations regarding safe and reliable operation.  Purchasers and lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the ACU Defect been disclosed.  Plaintiffs and the Classes were deprived of a safe, defect-free ACU installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they simultaneously avoided incurring the costs associated with recalls and installing replacement parts for many years.

20.     Plaintiffs and the Classes also will likely suffer damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.  Also, as a direct result of misconduct by Defendants, each Plaintiff and Class member will likely incur out-of-pocket economic damage by virtue of their incurring the expense of taking the time to eventually bring their cars in for repairs, once all Vehicle Manufacturer Defendants issue recalls.

21.     Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of their vehicles with defective TRW ACUs.  Defendants' false representations and omissions concerning the safety and reliability of those vehicles and their concealment of the known safety defects plaguing their vehicles and brands, caused Plaintiffs and Class members to purchase or retain vehicles of diminished value.

22.     Further, Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer and business expectations regarding safe and reliable operation.

23.     As a direct result of Defendants' conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for diagnosis, repair and/or replacement costs, damages for the diminished value of their vehicles, compensatory,

statutory and punitive damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

## JURISDICTION AND VENUE

24.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in the State of Florida and this District; actions giving rise to the Complaint took place in the State of Florida and this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and, at or about the time of such injuries, Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants elsewhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

26.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2), because they are subject to personal jurisdiction in this District. Also, venue is proper in this District pursuant to 28 U.S.C. § 1407.

## THE PARTIES

### I.  TRW Defendants

27.     Defendant ZF Friedrichshafen AG ("ZF TRW") is a foreign for-profit corporation with its principal place of business in Friedrichshafen, Baden-Wurttemberg, Germany.  ZF TRW is a worldwide supplier of driveline and chassis technology for cars and commercial vehicles, including active and passive safety technology.   ZF TRW, either directly or through its wholly-owned subsidiaries, manufactures ACUs for distribution in the United States and ultimate use in Florida, including the Defective ACUs at issue in this litigation.  ZF TRW delivers its products, including the Defective ACUs at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

28.     ZF TRW Automotive Holdings Corp. ("TRW Automotive Holdings") is a subsidiary of ZF TRW with its principal place of business in Livonia, Michigan.  TRW Automotive Holdings is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants. TRW Automotive Holdings sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the Defective ACUs in this litigation. TRW Automotive Holdings delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including in the State of Florida.

29.     TRW Automotive Inc. ("TRW Automotive") is a subsidiary of ZF TRW with its principal place of business in Livonia, Michigan.  TRW Automotive is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants.  TRW Automotive sells, designs, manufactures, tests, markets, and distributes airbag control units in the United States, including the State of Florida.  TRW Automotive manufactures ACUs in the United States, including the Defective ACUs at issue in this litigation.  TRW Automotive delivers its products into the stream of commerce with the

expectation that they will be purchased by consumers in the United States, including the State of Florida.

30.     TRW Automotive U.S. LLC ("TRW Automotive U.S.") is a subsidiary of TRW Automotive with its principal place of business in Livonia, Michigan.  TRW Automotive U.S. is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants.  TRW Automotive U.S. sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the Defective ACUs at issue in this litigation.  TRW Automotive U.S. delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

31.     TRW Vehicle Safety Systems Inc. ("TRW Vehicle Safety Systems") is a subsidiary of TRW Automotive Holdings with its principal place of business in Farmington Hills, Michigan.  TRW Vehicle Safety Systems is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants.  TRW Vehicle Safety Systems sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the Defective ACUs at issue in this litigation.  TRW Vehicle Safety Systems delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

32.     Defendants ZF TRW, TRW Automotive Holdings, TRW Automotive, TRW Automotive U.S., and TRW Vehicle Safety Systems are collectively referred to as "TRW" or the "TRW Defendants."  TRW is the manufacturer of all the Defective ACUs that are the subject of this litigation.

## II.     **Vehicle Manufacturer Defendants**

33.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan.  Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

34.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California.   American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

35.     Defendant Honda of America Mfg. Inc. ("Honda Mfg.") is an Ohio corporation with its principal place of business in Marysville, Ohio. Honda Mfg. is a subsidiary of Honda Motor. Honda Mfg. is involved in the design, manufacture, testing, marketing, distribution and sale of Honda vehicles in the United States, including those utilizing the Defective ACUs.

36.     Defendant Honda R&D Co. Ltd. ("Honda R&D") is a Japanese corporation with its principal place of business in Wako, Japan. Honda R&D is a subsidiary of Honda Motor. Honda R&D is involved in the design, development, manufacture, assembly, testing, distribution and sale of Honda vehicles, including those utilizing the Defective ACUs.

37.     Defendants Honda Motor, Honda Mfg., Honda R&D, and American Honda are collectively referred to as "Honda" or the "Honda Defendants."  Honda vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants.  The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

38.     Defendant Hyundai Motor Group ("Hyundai Group") is a foreign for-profit corporation with its principal place of business in Seoul, South Korea.  Hyundai Group manufacturers automobiles, steel, and automotive parts.

39.     Defendant Hyundai Motor Company ("Hyundai Motor") is a subsidiary of Hyundai Group and is headquartered in Seoul, South Korea. Hyundai Motor manufactures and sells automobiles through independent retail dealers, outlets, and authorized dealerships primarily in North America, South America, Asia, Europe, Africa, and Oceania.

40.     Defendant Hyundai Motor America ("Hyundai America") is a subsidiary of Hyundai Motor headquartered in Fountain Valley, California.  Hyundai America conducts the sale, marketing, and operational activities for Hyundai cars, trucks, sport utility vehicles, and automobile parts in the United States. Hyundai America manufactures and assembles its vehicles for sale in the United States in an automobile plant located in Montgomery, Alabama.

41.     As used in this Complaint, "Hyundai Defendants" refers to Hyundai Motor Group, Hyundai Motor, and Hyundai America.  Hyundai vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants.  The Hyundai Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

42.     The Hyundai Defendants engineered, designed, developed, manufactured, or installed the Defective ACUs in the Hyundai branded Class vehicles (defined below), and approved the Defective ACUs for use in those vehicles.  They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell those Class Vehicles.

43.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States. Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

44.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota. Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota.

45.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan. TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada. TEMA is a subsidiary of Toyota Motor Corporation.

46.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants."  Toyota vehicles sold in the United States contain Defective ACUs manufactured by the TRW Defendants.  The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of Florida.

47.     Collectively, these parties are referred to as the "Vehicle Manufacturer Defendants."

### III.   Plaintiffs

48.     Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use. Plaintiffs and the proposed Classes were harmed and suffered actual damages. The defective TRW ACUs significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and/or equipped with TRW ACUs and the widespread publicity of the ACU Defect.

49.     Further, Plaintiffs and the proposed Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented and did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiffs and the Classes, either through a higher purchase price or higher lease payments, paid more than they would have had the ACU Defect been disclosed. Plaintiffs and the Classes were deprived of having safe, defect-free ACUs installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts.

50.     Plaintiffs and the proposed Classes will also suffer damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs

associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

51.     Members of the proposed Classes, who will have to bring their vehicles to dealerships, will also suffer out-of-pocket economic damage by virtue of their incurring the expense of taking the time to bring their car in for repairs.

52.     The defective TRW ACUs create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Classes.

Adalgisa Santos—Florida

53.     Plaintiff Adalgisa Santos resides in Miramar, Florida.  Plaintiff Santos purchased a used 2017 Toyota Corolla on March 10, 2019 for approximately $13,714.94 from Al Hendrickson Toyota in Coconut Creek, Florida.  The value of her 2017 Toyota Corolla has been diminished as a result of the ACU Defect.  Plaintiff Acosta would not have purchased the 2017 Toyota Corolla or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

Carl Paul Maurilus—Florida

54.     Plaintiff Carl Paul Maurilus resides in Miramar, Florida.  Plaintiff Maurilus purchased a new 2017 Hyundai Sonata on March 19, 2017 for approximately $33,689.89.  The value of 2017 Hyundai Sonata has been diminished as a result of the ACU Defect.  Plaintiff Maurilus would not have purchased the 2017 Hyundai Sonata or would not have paid as much for it had he known of the problems or risk associated with the vehicle's ACU Defect.

Courtney Maine —Florida

55.     Plaintiff Courtney Maine resides in Fort Lauderdale, Florida. Plaintiff Maine purchased a used 2012 Honda Civic Coupe on February 29, 2016 for approximately $11,995.00 in

Orlando, Florida.  The value of her 2012 Honda Civic Coupe has been diminished as a result of the ACU Defect.  Plaintiff Maine would not have purchased the 2012 Honda Civic Coupe or would not have paid as much for it had she known of the problems or risk associated with the vehicle's ACU Defect.

## GENERAL FACTUAL ALLEGATIONS

**I.**   **Definitions**

56.   Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the Defective ACUs in the Class Vehicles, including, but not limited to, diminished value.  Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties and injunctive relief/equitable relief.

57.   "Class Vehicles" refers to all vehicles in the United States that were manufactured, sold, or leased by Vehicle Manufacturer Defendants and are equipped with Defective ACUs (defined below).

58.   "Defective ACUs" refers to all ACUs manufactured by TRW that contain the ACU Defect, including (a) all ACUs subject to recall or currently under investigation by NHTSA, identified in the table in paragraph 64 below; and (b) all TRW ACUs in Defendants' vehicles subject to any subsequent expansion of pre-existing recalls or new recalls announced prior to the date of an order granting class certification, relating to the tendency of such ACUs to fail and prevent the deployment of airbags and engagement of seatbelt pretensioners.

59.   All Defective ACUs contain the common uniform ACU Defect. As a result of the ACU Defect, Defective ACUs have an unreasonably dangerous tendency to fail to deploy airbags and engage seatbelt pretensioners.

60.     The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles manufactured by Vehicle Manufacturer Defendants that contain the ACU Defect ("Class Vehicles"):

| Automaker | Make | Model | Model Years |
|---|---|---|---|
| Honda | Acura | RLX | 2014-2019 |
| Honda | Acura | RLX Hybrid | 2014-2019 |
| Honda | Acura | TL | 2012-2014 |
| Honda | Acura | TLX | 2015-2017 |
| Honda | Acura | TSX | 2012-2014 |
| Honda | Acura | TSX Sport Wagon | 2014 |
| Honda | Acura | TSX Sport Wagon | 2012-2014 |
| Honda | Honda | Accord | 2013-2015 |
| Honda | Honda | Accord Hybrid | 2014-2015 |
| Honda | Honda | Civic | 2012-2015 |
| Honda | Honda | Civic GX | 2012-2015 |
| Honda | Honda | Civic Hybrid | 2012-2015 |
| Honda | Honda | Civic SI | 2012-2015 |
| Honda | Honda | CR-V | 2012-2016 |
| Honda | Honda | Fit | 2012-2017 |
| Honda | Honda | Fit EV | 2013-2014 |
| Honda | Honda | Ridgeline | 2012-2014 |
| Toyota | Toyota | Avalon | 2012-2018 |
| Toyota | Toyota | Avalon Hybrid | 2013-2018 |
| Toyota | Toyota | Corolla | 2011-2019 |
| Toyota | Toyota | Corolla IM | 2017-2018 |
| Toyota | Toyota | Corolla Matrix | 2011-2013 |
| Toyota | Toyota | Sequoia | 2012-2017 |
| Toyota | Toyota | Tacoma | 2012-2019 |
| Toyota | Toyota | Tundra | 2012-2017 |
| Hyundai | Hyundai | Sonata | 2013-2019 |
| Hyundai | Hyundai | Sonata Hybrid | 2013-2019 |

## II.     TRW ACUs Have a Common, Uniform Defect

61.     The component part at issue in this matter is the ACU, which contains the ASIC. The ASIC is an electronic component within the ACU that monitors signals from crash sensors.

The ACU is located in the vehicle's passenger compartment, and it connects the ASIC, via electrical wiring, to sensors located at the front of the vehicle. The ASIC monitors the signals from crash sensors located in the vehicle.

62.     Immediately following a collision, the ACU is supposed to detect the collision and signal the safety devices to deploy and/or engage if necessary. Specifically, the ACU causes the airbag inflator to ignite the airbag propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand or deploy, to protect the vehicle occupant from serious injury or death. Simultaneously, the ACU causes the seatbelt pretensioner to deploy or engage, removing slack from the occupant's seatbelt, pulling the occupant's body firmly into his seat, and milliseconds later, releasing the occupant in a timely manner to receive the maximum protection benefit of the deployed airbag.

63.     The ACU incorporates electrical circuitry, such as diodes, to protect the ASIC from harmful electrical signals that could disrupt or damage its performance. However, this electrical circuitry has proven to be insufficient as the Defective ACUs are experiencing electrical overstress conditions. This overstress results in damage to the ASIC and ultimately causes ASIC failure. A failure of the ASIC prevents deployment of the required airbags and safety devices, or it may otherwise affect the proper operation of the ACU. This failure of the ACU can subject the vehicle occupant to significant injury, and even death, in the event of a collision.

A.     **Defendants' Knowledge of the Defect**

64.     Defendants have long known about the ACU Defect, yet have fraudulently, intentionally, negligently and/or recklessly concealed the defect from Plaintiffs and the public.

65.     Since 2011, there have been countless non-deployment incidents caused by the Defective ACUs. Despite involvement in investigations and knowledge of the ACU Defect, the Defendants have refused to recall vehicles containing the ACU Defect and/or have improperly narrowed the scope of the affected vehicles in order to save costs and avoid negative publicity.

66.     TRW and Hyundai, for example, had knowledge of the ACU Defect at least as early as August 2011, when Hyundai requested that TRW analyze the ACU from a vehicle in China involved in an event in which the airbags did not deploy.  TRW observed damage on the ASIC that was consistent with EOS.

67.     EOS related incidents became recurring events over the next few years. In February 2012, for example, Hyundai was notified of another collision involving a 2011 Hyundai Sonata airbag non-deployment incident.  Then in March 2012, TRW communicated with Hyundai regarding its analysis of an ACU from a Kia Forte in Egypt involved in an event in which the airbags did not deploy, wherein TRW observed damage on the ASIC that was consistent with EOS.

68.     Again, in May 2012, TRW communicated with Hyundai about the investigation of field events with observed EOS.  In June 2012, Hyundai inspected a vehicle involved in a non-deployment incident and found no crash event recorded on the EDR.  Hyundai requested TRW's assistance into the investigation.  Despite these various incidents, neither TRW nor Hyundai implemented any recalls.

69.     In March 2014, Hyundai was named in a lawsuit involving an airbag non-deployment incident in a 2012 Kia Forte, which was reported to NHTSA through an Early Warning Report.  NHTSA subsequently sent Hyundai an inquiry regarding the non-deployment incident, to which Hyundai responded.  From March to June of 2015, Hyundai attempted to download data from the ACU of the 2012 Kia Forte that was the basis of the March 2014 lawsuit, but was unable to communicate with the ACU.  Hyundai requested assistance from TRW, who was also unable to obtain any data.  During this time, Hyundai referred the issue to TRW, which concluded that non-deployment occurred.  Despite its actual knowledge of this dangerous safety defect, Hyundai, however, still refused to issue recalls.

70.     Hyundai and TRW continued to investigate other non-deployment incidents.  In February 2015, at Hyundai's request, TRW downloaded available data from an ACU installed in a Hyundai Sonata involved in an event in which the airbags did not deploy.  In May 2015, Hyundai was notified of a collision involving another incident of airbag non-deployment in a 2011 Hyundai

Sonata, and TRW downloaded available data from an ACU installed a Kia Forte involved in an event in which the airbags did not deploy.

71.     In the summer of 2015, TRW advised Hyundai that NHTSA was investigating airbag non-deployment incidents affecting a wide range of vehicle models containing TRW ACUs. Then in October 2015, Hyundai again inspected a vehicle and found that the vehicle's ACU was non-communicative.  Despite the above and Hyundai's and TRW's independent knowledge of the ACU Defect, Hyundai and TRW continued to conceal the defect from the public and failed to issue any recalls.

72.     According to information filed with NHTSA, in January 2016, TRW communicated with the Vehicle Manufacturer Defendants regarding the EOS effect on the ACU. Then on February 2016, TRW met with NHTSA, at TRW's request, to discuss its investigation of EOS observed on its ACUs and incidents involving non-deployment of airbags.  TRW also provided information regarding all manufacturers with the Defective ACUs to NHTSA.

73.     Between July and November 2016, Hyundai received two additional reports of collisions involving 2011 Hyundai Sonata vehicles in which similar incidents of airbag non-deployment occurred.  Hyundai did not inform consumers or issue a recall.

74.     Upon information and belief, in August 2016, TRW disclosed to the Vehicle Manufacturer Defendants that non-party automaker, Fiat Chrysler, had decided to recall certain models containing TRW ACUs. A month later, in September 2016, TRW communicated again with each of the Vehicle Manufacturer Defendants about its ongoing investigation of the ACU Defect and its investigation with NHTSA. None of the Vehicle Manufacturer Defendants issued a recall or informed the public and its consumers of the defect.

75.     On September 13, 2016, Chrysler filed its first Part 573 Safety Recall Report for vehicles that could experience a loss of airbag and seatbelt pretensioner deployment capability due to damage to the ASU's ASIC.  This recall affected approximately 1.5 million Chrysler vehicles. Despite the significant number of recalled vehicles, the Vehicle Manufacturer Defendants

continued to resist implementing their own recalls or informing the general public of the ACU Defect.

76.     In 2017, Transport Canada requested information from Hyundai and TRW regarding a non-deployment event incident in a 2013 Kia Forte Koup in Canada following a crash which resulted in the vehicle's destruction.  In August 2017, TRW and Hyundai conducted a joint inspection at a TRW facility of the ACU of the 2013 Forte Koup that had been flagged by Transport Canada.  The inspection identified internal damage to the ASIC and that no EDR data was recorded.

77.     During September through October 2017, Hyundai received and responded to an inquiry from NHTSA regarding the non-deployment of the 2013 Forte Koup incident in Canada. In November 2017, NHTSA's Office of Defects Investigation ("ODI") contacted Hyundai to obtain follow-up information in connection with one of the four vehicles under investigation.

78.     In December 2017, faced with the seriousness of the ACU Defect, Hyundai finally engaged a third-party engineering firm to study and analyze the facts and circumstances surrounding its investigation and reassessment. Hyundai, however, never informed the public or issued a recall.

79.     On February 27, 2018, Hyundai finally issued a limited safety recall on model year 2011 Hyundai Sonata vehicles, effectively conceding that the ACU Defect manifesting itself in its vehicles bore enough similarities to the Chrysler recall issued nearly two years earlier. Hyundai's recall continued to put TRW and the Vehicle Manufacturer Defendants on notice of the ACU Defect.  Despite the use of the Defective ACUs in other non-recalled Hyundai vehicles and despite the number of non-deployment incidents in its other non-recalled vehicles since as early as 2011, Hyundai resisted recalling its Kia Forte or other vehicles.  Indeed, the first Hyundai recall was improperly narrow, covering only half a million Hyundai Sonata vehicles.

80.     In March 2018, TRW communicated with the other Vehicle Manufacturer Defendants regarding the ACU Defect and the status of its investigation. Defendants Honda and Toyota refused to issue any recalls, despite TRW's communications, prior recalls involving the

Defective ACUs, and their own knowledge of non-deployment incidents reported by their customers.

81.     On March 16, 2018, NHTSA opened an initial investigation into the ACU Defect, which, at that time, had caused front air bags to fail to deploy in numerous crashes, resulting in at least six injuries and four deaths.  Although initially focused on certain Hyundai vehicles, NHTSA identified TRW as the supplier of the Defective ACUs, thereby putting the other Vehicle Manufacturer Defendants on notice that their vehicles contained the same Defective ACUs NHTSA was investigating. At this point, each of the Vehicle Manufacturer Defendants certainly knew or should have known that their vehicles with TRW ACUs contained a defect.

82.     On March 9, 2018, Hyundai tentatively concluded that the root cause of the ACU Defect was likely to involve a component/equipment issue.  This conclusion was based on its finding as to the relative susceptibility of the subject ACU to EOS due to the lack of Schottky diodes, a feature included in subsequent ACU versions provided by TRW starting with model year 2013 and later Hyundai Sonata and Sonata Hybrid vehicles.

83.     On April 19, 2019, NHTSA upgraded its investigation of the ACU Defect involving TRW ACUs from a Preliminary Evaluation to an Engineering Analysis, in order to "expand the scope of the investigation to include [TRW], the Tier-one supplier and any manufacturers who installed this unit in production vehicles."  NHTSA's upgrade to an Engineering Analysis only further confirmed what the Vehicle Manufacturer Defendants knew or should have known as to the severity of the ACU Defect and widespread scope of their affected vehicles.

84.     Notably, NHTSA's Engineering Analysis also disclosed that ODI had recently identified two substantial front crash events involving airbag non-deployments in MY 2018 and MY 2019 Toyota Corollas.  NHTSA found that, following the collisions, the ACUs could not be read with an EDR, similar to the condition found in other incidents involving non-deployment of airbags in other OEMs' vehicles caused by EOS.  NHTSA further concluded EOS was the likely cause of the non-deployments in the Toyota incidents.  One of these crash events resulted in a fatality.

85.     As discussed above, the Vehicle Manufacturer Defendants shared knowledge of the ACU Defect not only through their knowledge of each of the recalls issued by Chrysler and Hyundai and TRW's communications advising them of NHTSA's investigation into the ACU Defect, but also because of several customer complaints involving the ACU Defect in their own vehicles.

86.     Honda was or should have been aware of several customer complaints submitted via NHTSA that would have alerted it to the ACU Defect. These complaints include the following:

a.     In March 2013, NHTSA received a complaint that during a severe vehicle crash where both the front and the side of the vehicle sustained damage, the airbags in a 2012 Acura TSX did not deploy, which resulted in the death of one of the passengers. The dealership explained to the vehicle owner that the airbags were "ok," but could not explain why they did not deploy.

b.     In November 2014, a Honda customer reported to NHTSA that her husband, while driving a 2013 Honda Accord, hit a tree and a mailbox, and then drove into a ditch head on, completely destroying the vehicle. However, the airbags did not deploy.

c.     In April 2015, another Honda customer reported that she was involved in a serious accident with her 2013 Honda Accord where she hit another vehicle, but the airbags did not deploy. Instead, when she opened the door of her vehicle to get out of the car, the airbags deployed, hitting the right side of her face and her neck, shoulder, and breast. The Honda dealer informed her it was an issue with the sensor.

d.     In May 2015, yet another Honda customer reported to NHTSA that she was involved in a head on collision with her 2013 Honda Accord where the airbag light came on, but the airbag did not deploy. She suffered injuries in the crash that required surgery. She was informed that the sensors and seatbelt structure needed to be replaced.

e.     In February of 2016, NHTSA received another complaint from a 2015 Honda Accord driver who was involved in an accident where the vehicle was deemed a total loss, but the airbags failed to deploy and the driver sustained a head injury.

f.       In October of 2016, a Honda dealer informed NHTSA that a Honda customer driving a 2013 Honda Accord hit a deer while driving 45 miles per hour, but the airbags on the driver's side failed to deploy. The vehicle was totaled.

g.       In September of 2018, NHTSA received a complaint about a 2015 Honda Accord that was involved in an accident where the vehicle was traveling 50 miles per hour and "CRASHED INTO A FIRE TRUCK. ALL OF THE AIR BAGS DEPLOYED [sic] WITH FORCE EXCEPT THE FRONT PASSENGER SIDE AIR BAG. THE DRIVER SUSTAINED SEVEN FRACTURES IN THE WRISTS, AND ALSO A NECK INJURY. MEDICAL TREATMENT WAS REQUIRED." The complaint further stated that "THE MANUFACTURER WAS NOTIFIED."

87.     Despite its communications with TRW, its knowledge of the Fiat Chrysler and Hyundai recalls related to the same Defective ACU in its own vehicles, and numerous customer complaints about the ACU Defect, Honda fraudulently, intentionally, and/or recklessly concealed the ACU Defect from its customers, NHTSA, and the public. To date, Honda has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

88.     Toyota was similarly aware or should have been aware of the numerous customer complaints regarding the ACU Defect in Toyota vehicles that were submitted to NHTSA. For example:

a.       In May 2013, NHTSA received a customer complaint about an accident involving a 2011 Toyota Corolla. The vehicle was involved in a serious traffic accident where the car was totaled, but the airbags did not deploy. The driver sustained serious injuries requiring multiple surgeries, after being launched from the driver's seat. The insurance adjuster informed the customer to contact Toyota to inquire about the airbags not deploying.

b.       In September of 2014, NHTSA received a complaint about a 2011 Toyota Corolla that was totaled but none of the airbags deployed even though the impact occurred at about 40 miles per hour.

c.      In April of 2014, NHTSA also received a complaint about an accident involving a 2011 Toyota Corolla, where the entire front end was crushed and the part of the vehicle under the steering wheel was pushed in towards the driver seat. None of the airbags in the vehicle deployed, and, as a result, the driver hit her head against the windshield, cracking the windshield. The driver also sustained chest contusions from the impact against the steering wheel. The customer contacted Toyota directly about the airbag's failure to deploy, but, according to the customer, Toyota called her "a liar." The customer requested the information from the EDR to be downloaded and read, but Toyota never responded to her request.

d.      NHTSA also received a complaint in January of 2015 that a 2013 Toyota Avalon rammed into a pole, but the airbags failed to deploy. The complaint stated that "THE MANUFACTURER WAS MADE AWARE OF THE FAILURE."

e.      In March of 2016, NHTSA was also informed that a 2014 Toyota Avalon Hybrid was involved in a front-end collision, in which the car was totaled, and the driver sustained injuries to the head, ribs, and shoulder, because the airbags failed to deploy.

f.      NHTSA was also informed in March of 2016 about another accident involving a 2011 Toyota Corolla that suffered an impact between 50 to 60 miles per hour. The entire front of the car was damaged, the bumper completely torn off, and the engine forced back from the frame of the vehicle. Nevertheless, none of the airbags deployed. Even though the driver was wearing his seatbelt, he hit his head near the windshield and sustained significant whiplash from the impact. The customer complained: "WE CANNOT BELIEVE THAT THE AIRBAGS WERE [not] DEPLOYED FROM AN IMPACT LIKE THIS. WE CHECKED AND THERE ARE NO RECALLS REGARDING AIRBAGS FOR THIS CAR. SOMETHING IS NOT RIGHT. THEY SHOULD HAVE GONE OFF AND PROTECTED MY HUSBAND DURING THIS COLLISION."

g.      In August of 2016, it was also reported to NHTSA that the driver of a 2014 Toyota Avalon was involved in a crash wherein the vehicle was traveling approximately 50 miles

per hour, but the airbags failed to deploy. The complaint stated that "THE MANUFACTURER WAS NOTIFIED OF THE FAILURE."

h.     In April of 2018, NHTSA was informed of another accident involving a 2014 Toyota Avalon Hybrid where the car was hit at 65 miles per hour, rolled over, and then was rammed into a rail. None of the airbags, however, deployed, and the driver of the vehicle suffered a head injury with a laceration and mild brain trauma.

89.     Despite its communications with TRW, its knowledge of the Fiat Chrysler and Hyundai recalls related to the same Defective ACU contained in its own vehicles, and numerous customer complaints about the ACU Defect, Toyota concealed the ACU Defect from its customers, NHTSA, and the public. To date, Toyota has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

**III.     The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe"**

90.     During all relevant times, through advertisements and promotional materials, the Vehicle Manufacturer Defendants continuously held out their vehicles as safe and reliable, while uniformly omitting any reference to the ACU Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements and omissions about Class Vehicles' safety in the Vehicle Manufacturer Defendants' advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

91.     Examples of Honda's safety and reliability representations include the following:

a.     In 2015, Honda represented on its website that "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

b.     In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority . . . .  Safety has been top of mind with Acura engineers since day one . . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

c.     In 2019, Honda represented on Acura's website that "Acura was the first luxury brand awarded top safety ratings across its entire model line.  ★★★★★ NHTSA 5-STAR OVERALL VEHICLE SCORE."

d.     In 2019, Honda also represented on Acura's website: "Our unrelenting mission to help keep you safe inspires technologies as innovative as they are effective. Protection is at the heart of Acura design. After all, an Acura can be replaced. Your family cannot."

92.     Similarly, Toyota's made representations as to  safety and reliability of its vehicles, which include the following:

a.     In 2015, Toyota represented on its website that "[f]or us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

b.     In 2018, Toyota represented on its website that the "2018 Toyota Corolla [i]s an IIHS [Top Safety Pick]."

c.     In 2019, Toyota represented in its brochure that "[s]afety is always in style. So we made it standard."

d.     In 2019, Toyota also represented in its brochure that "[a] driver and front passenger Advance Airbag System, driver and front passenger seat-mounted side airbags, front and rear side curtain airbags, and driver knee and front passenger seat-cushion airbags come standard on Corolla. It's all part of a system designed to help keep you safe."

93.     Hyundai also represented that their vehicles were safe:

a.    In 2017, Hyundai represented on its website: The Hyundai "SONATA [was] named a 2017 IIHS Top Safety Pick+."

b.    In 2019, Hyundai also represented on its website: "It's always been our aim to engineer the safest cars in the industry[.]"

c.    In 2019, Hyundai also represented on its website that "[y]ou can't overstate the importance of keeping the people you love safe, which is why we can't overstate the importance of always striving to make our safety features more advanced and innovative."

94.    Despite such representations, the Vehicle Manufacturer Defendants failed to equip the Class Vehicles with ACUs that would meet these standards and failed to disclose to consumers that their vehicles actually contained dangerous and Defective ACUs.

## IV.  The Vehicle Manufacturer Defendants' Failure to Issue Recalls and Issuance of Late and Inadequate Recalls

95.    Honda and Toyota, still refuse to issue any recalls of the ACU Defect, despite the rising number of ACU failures in its own vehicles, the Fiat Chrysler and Hyundai recalls, the NHTSA investigation, and its own communications with TRW about the ACU Defect.

96.    While Hyundai has issued recalls, these recalls occurred years after investigating the ACU Defect and conferring with TRW and NHTSA on the same.  Furthermore, Hyundai's two recalls have been woefully inadequate, as they exclude many other Hyundai vehicles with the ACU Defect, which are currently under investigation by NHTSA.

97.    There are currently 12.3 million vehicles that have not been recalled and are the subject of an ongoing NHTSA investigation into the ACU Defect.

98.    Given the large number of affected vehicles, when all the vehicles containing the ACU Defect are ultimately recalled, it will be unlikely that they will be repaired in the near term.

99.    As the executive director of the Center for Auto Safety ("CAS") explained, it could not be more apparent that "the auto industry thus far has learned very little from Takata"—the largest automotive recall in U.S. history, resulting in at least 24 deaths and countless more injuries—in light of the actions, or lack thereof, of Defendants in the face of yet another dangerous

vehicle defect that has already claimed at least eight lives.  As CAS's director further explained: "While the first fatality reports [relating to the ACU Defect] emerged three years ago, it has taken a higher body count for more significant action to be taken by NHTSA and most impacted manufacturers remain silent.  The industry needs to do better," and most certainly needs to be held accountable.

### A.   Failure to Provide Replacement Vehicles

100.   Not only have Vehicle Manufacturer Defendants failed recall Class Vehicles, they have failed to provide any other form of assistance, despite Class Vehicles not being safe to drive.

101.   Only Hyundai is providing loaner or replacement vehicles to Class members with Defective ACUs for the limited number of vehicles it has recalled.

102.   Due to Defendants' failures, Plaintiffs and Class members are left with poor options—be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendants complete and/or issue and complete a recall; or, use a vehicle with a dangerously Defective ACU over an extended period of time.

103.   As Senators Blumenthal and Markey explained in the Takata recalls related to defective airbags, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

### TOLLING OF THE STATUTE OF LIMITATIONS

#### Fraudulent Concealment

104.   Upon information and belief, Defendants have known or should have known about the ACU Defect in their Defective ACUs since at least January 2016, when TRW informed the Vehicle Manufacturer Defendants of the ACU Defect. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the ACU Defect or Defendants' deception with respect to the ACU Defect.

105.   Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a

defect and/or that the Class Vehicles contained an ACU Defect and corresponding safety risk. As alleged herein, the existence of the ACU Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the ACU Defect, the associated safety risk, or that Defendants were concealing the defect.

106.    Defendants did not fully investigate or disclose the seriousness of the ACU Defect, but instead ignored and concealed the defect from consumers and the public and refused to initiate recalls to remedy the defect or issued belated, insufficient recalls.

107.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the ACU Defect and corresponding safety risks.

108.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment.

109.    For these reasons, any and all applicable statute of limitations have therefore been tolled as a consequence Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## II.    **Estoppel**

110.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, and their safety components. They actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles, and their safety components. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

III.     **Discovery Rule**

111.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective ACUs.

112.    Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective, until—at the earliest—their airbag(s) failed to deploy or they learned of NHTSA's investigation into the ACU Defect. Even then, Plaintiffs and Class members would have had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect, and prior knowledge of it.

## CLASS ACTION ALLEGATIONS

113.    The Classes' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, conduct, and products. Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many—and for some claims, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rule of Civil Procedure 23(a); and (b)(3), and/or (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

I.     **The Consumer Classes**

114.    The Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rule of Civil Procedure 23(a); and (b)(2), and/or (b)(3), and/or (c)(4); on behalf of themselves and a Nationwide Consumer Class defined as follows:

All persons in the United States who entered into a lease or bought a Class Vehicle, and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

115.    The Plaintiffs allege statewide class action claims on behalf of classes in the following states: Florida, XXXXX, and XXXX. Each of these State Consumer Classes is initially defined as follows:

All persons who entered into a lease or bought a Class Vehicle in the state of ____ (*e.g.*, Florida), and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

## II.    <u>Numerosity and Ascertainability</u>

116.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide and thousands, if not more, Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

117.    Each of the Classes are ascertainable because their members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A), and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## III.    <u>Predominance of Common Issues</u>

118.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3), because questions of law and fact have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These common and predominating questions of law and fact include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the ACU Defect;

b.    Whether Defendants knew or should have known about the ACU Defect; and, if so, how long Defendants have known of the defect;

c.      Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

e.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing or leasing the Class Vehicles;

f.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.      Whether Defendants misrepresented that the Class Vehicles were safe;

h.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with the ACU Defect;

i.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.      Whether Defendants violated each of the States' consumer protection statutes and, if so, what remedies are available under those statutes;

l.      Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.;

m.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

n.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

- 32 -

o.      Whether the Class Vehicles suffered a diminution of value because of the Defective ACUs;

p.      Whether Defendants have been unjustly enriched by their conduct;

q.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

r.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the ACUs in the Class Vehicles are defective and/or not merchantable;

s.      Whether Defendants should be declared responsible for notifying all Class members of the ACU Defect, and ensuring that all vehicles with the ACU Defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants, and to vindicate statutory and public policy; and

u.      How such penalties should be most equitably distributed among Class members.

## IV.    **Typicality**

119.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.    **Adequate Representation**

120.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

121.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    **Superiority**

122.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendants have acted, and refused to act, on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

123.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

124.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

125.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

126.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and

reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

127.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the ACU Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective ACUs implicate the Class Vehicles; constitute evidence supporting various claims, including diminution of value; and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls; and because of the installation of Defective ACUs as replacement airbags. The increased risk of injury from the ACU Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## CLAIMS FOR RELIEF

I.    **Nationwide Claims**

A.    **Federal Claims Against the Vehicle Manufacturer Defendants**

### COUNT 1

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***

128.    Plaintiffs bring this Count against the Vehicle Manufacturer Defendants on behalf of members of the Nationwide Consumer Class.

129.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a)-(d).

130.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

131.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

132.    The Vehicle Manufacturer Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

133.    The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty under 15 U.S.C. § 2310(d)(1).

134.    The Vehicle Manufacturer Defendants provided Plaintiffs with express warranties, which are covered under 15 U.S.C. § 2301(6). These express warranties included the repair or replacement of covered defective components arising out of defects in materials and/or workmanship, which would include the ACU Defect, at no cost to owners and lessees of the Class Vehicles.

135.    The Vehicle Manufacturer Defendants further provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, the Vehicle Manufacturer Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

136.    The Vehicle Manufacturer Defendants breached these warranties by failing to disclose and fraudulently concealing information regarding the ACU Defect and failing to timely and sufficiently recall Class Vehicles to repair or replace Defective ACUs, as described above. Defendants are therefore liable to Plaintiffs and the Class, pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective ACUs.

137.    Plaintiffs and members of the Class experienced the ACU Defect within the warranty periods but Defendants failed to inform Plaintiffs and members of the Class of the existence of the ACU Defect and associated safety risk, and failed to provide a suitable remedy or repair of the ACU Defect free of charge within a reasonable time.

138.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

139.    Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between the Vehicle Manufacturer Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

140.    Any limitations on the warranties are substantively unconscionable. The Vehicle Manufacturer Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. The Vehicle Manufacturer Defendants failed to disclose the ACU Defect to Plaintiffs and the other Class members. Thus, the Vehicle Manufacturer Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

141.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either the Vehicle Manufacturer Defendants or their agents (dealerships) to establish privity of contract.

142.    Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the Vehicle Manufacturer Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

143.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Vehicle Manufacturer Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

144.    Furthermore, affording the Vehicle Manufacturer Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Class Vehicle, the Vehicle Manufacturer Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Vehicle Manufacturer Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

145.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because the Vehicle Manufacturer Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

146.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

147.    Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorney's fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

148.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have or will incur in attempting to rectify the ACU Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must

take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in getting their Class Vehicles repaired and/or going through the recall process.

149.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Vehicle Manufacturer Defendants' conduct presents common questions of law. Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by the Vehicle Manufacturer Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## B.    Common Law and State Law Claims Against TRW

### COUNT 2

### Fraudulent Concealment

150.    Plaintiffs bring this claim against TRW on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

151.    As described above, TRW made material omissions and/or affirmative misrepresentations regarding the Defective ACUs contained in the Class Vehicles.

152.    TRW intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belts, thereby failing to protect drivers and passengers in a collision.

153.    TRW still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect from Plaintiffs and the Class.

154.    TRW had a duty to disclose the ACU Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

c.    Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and/or Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

155.    These omitted and concealed facts were material because they would be relied upon by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products are material concerns to a consumer.

156.    TRW concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely.

157.    TRW also misrepresented the safety and reliability of the Defective ACUs and/or Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

158.    TRW actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its ACU units, to protect its profits, and to avoid recalls that would hurt the brand's image and cost TRW money. It did so at the expense of Plaintiffs and the Class.

159.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

160.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and TRW's disregard for safety, Plaintiffs and the Class either would have paid less for their Class

Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of TRW's fraudulent concealment.

161.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of TRW's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by TRW's conduct.

162.    The value of all Class members' vehicles has diminished as a result of TRW's fraudulent concealment of the ACU Defect and has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

163.    Accordingly, TRW is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the Defective ACUs.

164.    TRW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching TRW. TRW's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### C.    Common Law and State Law Claims Against Honda

### COUNT 3

### Fraudulent Concealment

165.    Plaintiffs bring this claim against Honda on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are

no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Honda under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

166.   As described above, Honda made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

167.   Honda intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

168.   Honda still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect, in efforts to avoid a costly recall.

169.   Honda had a duty to disclose the ACU Defect because it:

a.   Had exclusive and/or far superior knowledge and access to the facts, and Honda knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.   Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

c.   Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

170.   These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Honda not to sell or lease them vehicles that were defective or that violated federal law governing

motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

171. Honda concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Honda and reasonably expected by consumers.

172. Honda also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

173. Honda actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Honda money. It did so at the expense of Plaintiffs and the Class.

174. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

175. Had they been aware of the Defective ACUs installed in the Class Vehicles, and Honda's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Honda's fraudulent concealment.

176. Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Honda's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Honda's conduct.

177. The value of all Class members' vehicles has diminished as a result of Honda's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

178.    Accordingly, Honda is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

179.    Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Honda. Honda's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 4

### Unjust Enrichment

180.    Plaintiffs (excluding those who did not purchase a Class Vehicle from a Honda dealership) bring this claim against Honda on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

181.    Honda has received and retained a benefit from the Plaintiffs and inequity has resulted.

182.    Honda benefitted through its unjust conduct, by selling Class Vehicles to Plaintiffs with a concealed safety-and-reliability related defect, at a profit, for more than these Class Vehicles were worth. Plaintiffs overpaid for these Class Vehicles, and/or would not have purchased these Class Vehicles at all. Furthermore, as a result, Plaintiffs have been forced to pay other costs.

183.    It is inequitable for Honda to retain these benefits.

184.    Plaintiffs do not have an adequate remedy at law.

185.    As a result of Honda's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**D.**    **Common Law and State Law Claims Against Hyundai**

**COUNT 5**

**Fraudulent Concealment**

186.    Plaintiffs bring this claim against Hyundai on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Hyundai under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

187.    As described above, Hyundai made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

188.    Hyundai intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

189.    Hyundai still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect contained in its vehicles.

190.    Hyundai had a duty to disclose the ACU Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and Hyundai knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

- 45 -

c.      Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs and Class Members that contradicted these representations.

191.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Hyundai not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

192.    Hyundai concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Hyundai and reasonably expected by consumers.

193.    Hyundai also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

194.    Hyundai actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Hyundai money. It did so at the expense of Plaintiffs and the Class.

195.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

196.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and Hyundai's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class

members did not receive the benefit of their bargain as a result of Hyundai's fraudulent concealment.

197.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Hyundai's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Hyundai's conduct.

198.    The value of all Class members' vehicles has diminished as a result of Hyundai's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

199.    Accordingly, Hyundai is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

200.    Hyundai's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Hyundai. Hyundai's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## **COUNT 6**

### **Unjust Enrichment**

201.    Plaintiffs (excluding those who did not purchase a Class Vehicle from a Hyundai dealership) bring this claim against Hyundai on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true

conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

202.    Hyundai has received and retained a benefit from the Plaintiffs and inequity has resulted.

203.    Hyundai benefitted through its unjust conduct, by selling Class Vehicles to Plaintiffs with a concealed safety-and-reliability related defect, at a profit, for more than these Class Vehicles were worth. Plaintiffs overpaid for these Class Vehicles, and/or would not have purchased these Class Vehicles at all. Furthermore, as a result, Plaintiffs have been forced to pay other costs.

204.    It is inequitable for Hyundai to retain these benefits.

205.    Plaintiffs do not have an adequate remedy at law.

206.    As a result of Hyundai's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

### E.    Common Law and State Law Claims Against Toyota

### COUNT 7

### Fraudulent Concealment

207.    Plaintiffs bring this claim against Toyota on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Toyota under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

208.    As described above, Toyota made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

209.    Toyota intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the

Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

210.    Toyota still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect.

211.    Toyota had a duty to disclose the ACU Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and Toyota knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

c.    Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

212.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Toyota not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

213.    Toyota concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by Toyota and reasonably expected by consumers.

214.    Toyota also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

215.    Toyota actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Toyota money. It did so at the expense of Plaintiffs and the Class.

216.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

217.    Had they been aware of the Defective ACUs installed in the Class Vehicles and Toyota's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Toyota's fraudulent concealment.

218.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Toyota's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by Toyota's conduct.

219.    The value of all Class members' vehicles has diminished as a result of Toyota's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

220.    Accordingly, Toyota is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

221.    Toyota's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Toyota. Toyota's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety,

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 8

### Unjust Enrichment

222.     Plaintiffs (excluding those who did not purchase a Class Vehicle from a Toyota dealership) bring this claim against Toyota on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

223.     Toyota has received and retained a benefit from the Plaintiffs and inequity has resulted.

224.     Toyota benefitted through its unjust conduct, by selling Class Vehicles to Plaintiffs with a concealed safety-and-reliability related defect, at a profit, for more than these Class Vehicles were worth. Plaintiffs overpaid for these Class Vehicles, and/or would not have purchased these Class Vehicles at all. Furthermore, as a result, Plaintiffs have been forced to pay other costs.

225.     It is inequitable for Toyota to retain these benefits.

226.     Plaintiffs do not have an adequate remedy at law.

227.     As a result of Toyota's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## II.     State Consumer Sub-Class Claims

### A.     Claims Brought on Behalf of the Florida Consumer Sub-Class

## COUNT 9

### Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

228.     This claim is brought only on behalf of the Florida Consumer Sub-Class against TRW, Honda, Hyundai and Toyota.

229.     Plaintiffs and the Florida Consumer Sub-Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Section 501.203(7), Florida Statutes

230.     Defendants are engaged in "trade or commerce" within the meaning of Section 501.203(8), Florida Statutes.

231.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." § 501.204(1), Fla. Stat. Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

232.     In the course of TRW's, Honda's, Hyundai's, and Toyota's business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

233.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective ACUs installed in them.

234.     As alleged above, TRW knew or should have known of the ACU Defect no later than January 2016, through its design and development of the ACU, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself and the automakers, internal investigations into airbag non-deployment incidents, government investigations into airbag non-deployment incidents, and public recalls.

235.     As alleged above, Hyundai knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls. Toyota also knew or should have known of the ACU Defect no later than January 2016,

though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls. Honda also knew or should have known of the ACU Defect no later than January 2016, though its approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, TRW, and the automakers, internal investigations, government investigations, and public recalls.

236. By failing to disclose and by actively concealing the ACU Defect in the Class Vehicles and/or the Defective ACUs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective ACUs to fail to deploy vehicle safety systems, including airbags and seatbelt pretensioners, in a collision event.

237. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious ACU Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective ACUs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

238. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Florida Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective ACUs installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

239.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead Plaintiffs and the Florida Consumer Sub-Class.

240.    Defendants knew or should have known that their conduct violated the FDUTPA.

241.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the ACU Defect or their failure to reasonably investigate it.

242.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

243.    Defendants owed Plaintiffs and the Florida Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Florida Consumer Sub-Class; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Florida Consumer Sub-Class that contradicted these representations.

244.    Because Defendants fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in negative publicity once the ACU Defect

finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

245.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to Plaintiffs and the Florida Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

246.    Plaintiffs and the Florida Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the ACU Defect that existed in the Class Vehicles and/or the Defective ACUs installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Florida Consumer Sub-Class either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Florida Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

247.    Plaintiffs and the Florida Consumer Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

248.    As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

249.    Plaintiffs and the Florida Consumer Sub-Class are entitled to recover their actual damages under Section 501.211(2), Florida Statutes, and attorneys' fees under Section § 501.2105(1), Florida Statutes.

250.    Plaintiffs and the Florida Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.      An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.      A declaration that the ACUs in Class Vehicles are defective;

C.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.      An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective ACUs in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the forthcoming recall of the vehicles and correction of the Defective ACUs;

G.      A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class

Vehicles, or make full restitution to Plaintiffs and Class Members;

H.      An award of attorneys' fees and costs, as allowed by law;

I.      An award of prejudgment and post-judgment interest, as provided by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

DATED: May 8, 2019

Respectfully submitted,

*/s/ David Boies*_____
DAVID BOIES
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY  10504
Telephone:  (914) 749-8200
Fax: (914) 749-8300

and

*/s/ Mark J. Heise*_____
STEPHEN N. ZACK
Florida Bar No. 145215
szack@bsfllp.com
MARK J. HEISE
Florida Bar No. 771090
mheise@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
100 S.E. Second Street, Suite 2800
Miami, FL  33131
Telephone: (305) 539-8400
Facsimile:  (305) 539-1307